**SUNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

IN RE
JOSEPHINE SMALLS MILLER

No. 3:25-gp-15 (SRU)

## **ORDER**

The Grievance Committee of the United States District Court for the District of

Connecticut (the "Grievance Committee") brings this presentment action to obtain reciprocal

discipline against Attorney Josephine Smalls Miller ("Miller") for violations of the Connecticut

Rules of Professional Conduct ("RPC") found by the Connecticut Superior Court.  Doc. No. 5.

Miller moves to dismiss the presentment.  Doc. No. 8.  I held a hearing on January 29, 2026 and

took the matter under advisement.  Doc. No. 18.  For the reasons stated below, I **deny** Miller's

motion to dismiss, doc. no. 8, but **decline to impose** reciprocal discipline against Miller.

## I.    Background

On March 3, 2025, the Connecticut Office of Chief Disciplinary Counsel ("OCDC") filed

a presentment alleging attorney misconduct against Miller in the Superior Court of Connecticut,

Judicial District of Danbury.  *See Office of Chief Disciplinary Counsel v. Josephine Smalls*

*Miller*, Dkt. No. UWY-CV25-6084169-S (Conn. Super. Ct.) ("2025 State Court Disciplinary

Case"), Doc. No. 100.30 at 1.  On October 7, 2025, the Connecticut Superior Court (the "state

court") found that Miller violated RPC 8.4 and 5.5.  *See generally* Doc. No. 1; 2025 State Court

Disciplinary Case, Doc. No. 129.00.  A corrected memorandum of decision was filed on

December 3, 2025.  2025 State Court Disciplinary Case, Doc. No. 129.10.  *See also* Doc. No. 12.

The facts giving rise to this action are set forth at length in the trial court's corrected memorandum of decision. *See* Doc. No. 12 at 1-9. In summary, the OCDC's presentment alleges one count of misconduct against Miller. *Id.* at 1; 2025 State Court Disciplinary Case, Doc. No. 100.30 at 1. Specifically, the presentment alleges Miller violated RPC 8.4(3) (professional misconduct), RPC 1.8(b) (conflict of interest: prohibited transactions), and RPC 5.5 (unauthorized practice of law), in connection with Miller's relationship with the complainant, Gwendolyn Samuel ("Samuel").[1] Doc. No. 12 at 1, 10-13. *See generally* 2025 State Court Disciplinary Case, Doc. No. 100.30. The trial court found by clear and convincing evidence that Miller: (1) violated RPC 8.4(3) by misrepresenting that a loan from Samuel to Miller was secured by Miller's property at 154 Hillside Avenue in Milford (Miller's "Milford property") and that Miller had the ability to repay the loan; and (2) Miller violated RPC 5.5 by engaging in "the unauthorized practice of law from March 10, 2021 through May 2, 2021, by providing legal advice and assistance to [Samuel] in her claim against the bank." Doc. No. 12 at 10-11, 17. The state court suspended Miller for one year for violating Rule 8.4(3) and disbarred her for violating Rule 5.5 by engaging in the unauthorized practice of law. *Id.* at 23. Those sanctions run concurrently. *Id.*

Consequently, on October 16, 2025, this Court received a Notice of Reciprocal Discipline. Doc. No. 1. The Grievance Committee filed a Presentment for Discipline on November 4, 2025, requesting that I impose identical discipline. Doc. No. 5. I issued an order to show cause on November 6, 2025. Doc. No. 6. Miller filed a motion to dismiss the presentment on December 4, 2025. Doc. No. 8.

---

[1] The state court's decision refers to the complainant as Gwendolyn Smith. Doc. No. 12 at 1. However, Miller's briefing and submitted records name the complainant as Gwendolyn Samuel. *See generally* Doc. No. 8; Doc. No. 16. Therefore, I refer to the complainant as Gwendolyn Samuel.

In her motion to dismiss, Miller argues that all four exceptions to imposing reciprocal discipline listed in Local Rule 83.2(f)(5) apply.  Doc. No. 8 at 1.  She asserts that "[t]he Connecticut disciplinary process was constitutionally defective, infected with personal animus, retaliation for protected speech, and marked by racially disparate treatment."  *Id.*

The Grievance Committee argues in opposition that Miller "fail[s] to establish by clear and convincing evidence that the Connecticut disciplinary proceedings contain a substantial defect under Local Rule 83.2(f)(5)."  Doc. No. 16 at 10.  Therefore, the Grievance Committee argues that reciprocal discipline should be imposed.  *Id.*

## II.    Standard of Review

Local Rule 83.2(f)(5)[2] governs when reciprocal discipline should be imposed in the District of Connecticut.  *See In re Williams*, 978 F. Supp. 2d 123, 124-25 (D. Conn. 2012).  Under Local Rule 83.2(f)(5), when the Grievance Committee petitions for the imposition of reciprocal discipline via a presentment action, the identical discipline must be imposed unless it clearly appears on the face of the record in the prior disciplinary proceeding:

    a.  [T]hat the procedure was so lacking in notice or opportunity to be heard as to constitute a deprivation of due process; or

    b.  that there was such an infirmity of proof establishing the misconduct as to give rise to the clear conviction that the Court could not, consistent with its duty, accept as final the discipline imposed; or

    c.  that the imposition of the same discipline by the Court would result in grave injustice; or

    d.  that the misconduct established is deemed by the Court to warrant substantially different discipline.

D. Conn. L. Civ. R. 83.2(f)(5).  If the court finds that one or more of the exceptions exists, "it shall enter such other order as it deems appropriate."  *Id.*  Further, "[u]pon good cause shown,

---

[2] The latest edition of the District of Connecticut Local Rules (the "Local Rules") became effective on January 12, 2026.  I cite to and apply the most recent iteration of the Local Rules, which may not align with the provisions cited in the parties' briefs.

the Court may set aside an order issued under Rule 83.2(f) when it is in the interest of justice to do so."  D. Conn. L. Civ. R. 83.2(f)(6).

"The standard of review in this proceeding is highly deferential to the state court's determination."  *In re Williams*, 978 F. Supp. 2d at 125 (citing *Theard v. United States*, 354 U.S. 278, 282 (1957)).  *See also In re Roman*, 601 F. 3d 189, 192-94 (2d Cir. 2010); *In re Edelstein*, 214 F.3d 127, 132 (2d Cir. 2000).  Miller has the burden to demonstrate by clear and convincing evidence that reciprocal discipline should not be imposed.  *In re Roman*, 601 F.3d at 193 (citing *In re Friedman*, 51 F.3d 20, 22 (2d Cir. 1995)).  Clear and convincing evidence:

> [D]enotes a degree of belief that lies between the belief that is required to find the truth or existence of the fact in issue in an ordinary civil action and the belief that is required to find guilt in a criminal prosecution. . . . The burden is sustained if evidence induces in the mind of the trier a reasonable belief that the facts asserted are highly probably true, that the probability that they are true or exist is substantially greater than the probability that they are false or do not exist.

*Somers v. Statewide Grievance Comm.*, 245 Conn. 277, 290-91 (1998) (alteration adopted) (internal quotation marks omitted) (quoting *Wildwood Associates, Ltd. v. Esposito*, 211 Conn. 36, 42 (1989)).

"When the presentment is contested, as it has been here," the court should not "act as a rubber stamp in the name of reciprocity."  *In re Williams*, 978 F. Supp. 2d at 125.  Instead, the court "must determine whether the record of the prior proceeding discloses a substantial defect covered by one of the exceptions to reciprocal discipline."  *Id.*

## III.    Discussion

The misconduct alleged by OCDC and reiterated by the Grievance Committee centers on two situations involving Samuel:  (1) emails between Miller and Samuel concerning a proposed settlement agreement and release; and (2) representations by Miller to Samuel in the course of

Miller obtaining a loan from Samuel that the loan would be secured by Miller's Milford property. Doc. No. 12 at 2-8.

Miller contends that the state court disciplinary process was constitutionally defective because: (1) "the process was so lacking in impartiality and fairness" that it violated her due process and equal protections rights; (2) "there was an infirmity of proof[;]" (3) "identical discipline would extend a punishment already disproportionate to the alleged violations[;]" (4) "different discipline is warranted[;]" (5) preventing Miller "from alleging racial bias as a condition of reinstatement is an unconstitutional prior restraint[;]" (6) "there is an appearance of bias" due to Judge Bellis and Judge Carroll's refusal to recuse; and (7) "the interests of justice dictate" not imposing reciprocal discipline. Doc. No. 8 at 5-6.

After considering the evidence in the record, I find that the second and third exception listed in Local Rule 83.2(f)(5) apply. Miller establishes by clear and convincing evidence that there was an infirmity of proof establishing that Miller's alleged misconduct violated Rule 8.4(3) and that my imposition of identical discipline for her alleged violation of Rule 5.5 would result in a grave injustice. D. Conn. L. R. 83.2(f)(5)(b)-(c).

A. *Whether there was an infirmity of proof establishing Miller's alleged misconduct under Rule 8.4(3) in connection with the loan from Samuel to Miller*

Miller contends that her actions and statements regarding the September 2021 promissory note (the "promissory note") demonstrate "proactive transparency, not deceit" and the state court overlooked her "intent to protect Samuel." Doc. No. 8 at 20-21. The Grievance Committee argues that I should assess whether Miller "made either statement in the promissory note with at least a reckless disregard for its truth or falsity." Doc. No. 23 at 7.

In September 2021, Miller requested a $35,000 loan from Samuel due to an impending tax sale of her Milford property. Doc. No. 12 at 4-5. Miller drafted a written promissory note,

5

which Miller suggested Samuel have another attorney review. *Id.* at 5. Samuel had an attorney review the draft note. *Id.* The note provided that Miller would repay Samuel the $35,000 principal plus $5,000 in interest by November 30, 2021 with a $200 per month late charge. *Id.* Further, the draft note provided that Miller's Milford property secured the loan. *Id.* The Milford property was valued at approximately $230,000 on September 18, 2021. *Id.* Samuel gave Miller a cashier's check for $35,000 "[a] day or two before the October 2 [tax] sale." *Id.*

After Miller paid the overdue taxes on October 1, 2021, the city told Miller she needed to file a motion to open the judgment and a caseflow request. *Id.* at 6. Miller filed the motion to open but did not file the caseflow request. *Id.* Further, she filed for personal bankruptcy on October 1 to stop the sale of her Milford property. *Id.* at 6-7. Miller informed Samuel about her bankruptcy filing "shortly thereafter." *Id.* at 7. However, Miller was unaware that the bankruptcy filing would result in her inability to obtain the loan through which she planned to pay Samuel back. *Id.*

Miller kept Samuel informed of the bankruptcy proceeding and attempted to pay Samuel back. *Id.* at 7-8. In May 2022, Miller voluntarily dismissed the bankruptcy proceeding because Miller feared she would lose the Milford property if her Chapter 13 bankruptcy was involuntarily converted to a Chapter 7 bankruptcy. *Id.* Samuel "was the first creditor that [Miller] paid, making a payment of $42,000." *Id.* at 8.

The state court held that Miller violated RPC 8.4(3) by misrepresenting that Samuel's loan was secured by Miller's Milford property "when it was not" and "by misrepresenting [Miller's] ability to repay the loan." *Id.* at 10-11. The state court concluded that Miller is "an experienced attorney who knew the difference between a secured and unsecured loan" and "knowingly did not take any of the steps necessary to prepare, provide, or file a mortgage deed"

to secure Samuel's loan. *Id.* Therefore, Miller "misrepresented a material fact of their transaction" by indicating to Samuel that the loan was secured by Miller's Milford property and providing the Milford property appraisal to Samuel "further[ed] the misrepresentation." *Id.* at 10. Once Miller filed for bankruptcy, Samuel was "an unsecured creditor in the bankruptcy proceedings." *Id.* at 11. Additionally, the state court determined that Miller misrepresented her ability to repay the loan because she "was overconfident in her ability to determine and obtain the amount of money needed to satisfy the judgment and pay the committee, have her loan approved, and pay the complainant back." *Id.*

Rule 8.4(3) states that "[i]t is professional misconduct for a lawyer to . . . [e]ngage in conduct involving dishonesty, fraud, deceit, or misrepresentation[.]" Conn. R. Pro. Conduct 8.4(3) (2026). Rule 8.4(3) does not require a finding of intent or that the misrepresentation resulted in injury. *Ansell v. Statewide Grievance Comm.*, 87 Conn. App. 376, 388-89 (2005) ("[W]e accordingly conclude that [Rule 8.4(3)] has no scienter requirement."). Instead, an attorney can violate RPC 8.4(3) by making statements that are "knowingly false" or with reckless disregard for their truth or falsity. *Burton v. Mottolese*, 267 Conn. 1, 51 (2003). *Cf. St. Amant v. Thompson*, 390 U.S. 727, 731 (1968) (holding "reckless disregard" for the accuracy of statements can be measured, in part, by whether there is "sufficient evidence" permitting "the conclusion that the [individual] in fact entertained serious doubts" about the truth of their publication).

Connecticut law defines a "promissory note" as an instrument evidencing "a promise to pay a monetary obligation" and a "security" as "an obligation of an issuer or a share, participation, or interest in an issue or in property or an enterprise of an issuer." Conn. Gen. Stat. § 42a-9-102(a)(69); *id.* § 42a-8-102(a)(14). A security is also defined as "[c]ollateral given or

7

pledged to guarantee the fulfillment of an obligation," especially "the assurance that a creditor will be repaid . . . any money or credit extended to a debtor." *Security*, Black's Law Dictionary (10th ed. 2014). *See also Collateral*, Black's Law Dictionary (10th ed. 2014) (defining collateral as "[p]roperty that is pledged as security against a debt"). Connecticut law governing mortgages and secured transactions is extensive. *See generally* Conn. Gen. Stat. § 49-1, *et seq.*; Conn. Gen. Stat. § 42a-9-101, *et seq.*[3]

In the draft promissory note, Miller made no representations regarding a mortgage deed. *See* Doc. No. 19-3 at 1. Instead, she simply offered her Milford property as collateral for Samuel's $35,000 loan. *Id.* at 1 ("As security for the repayment of this note, I agree to pledge the real property located at 154 Hillside Avenue, Milford, Connecticut 06460."). Miller testified to her belief "that by making specific reference to the property in the note," Miller created a security interest and that she was not aware a mortgage deed was necessary. Doc. No. 16 at 160; *id.* at 161 ("My assumption was that if [Samuel's attorney] had looked at this and g[a]ve her the

---

[3] Further, "security" as defined in the bankruptcy code is not identical to the definition of "security" in the context of property pledged in a promissory note. *See* 11 U.S.C. § 101(49). Under the bankruptcy code, a "security" can include a:

(i) note; (ii) stock; (iii) treasury stock; (iv) bond; (v) debenture; (vi) collateral trust certificate; (vii) pre-organization certificate or subscription; (viii) transferable share; (ix) voting-trust certificate; (x) certificate of deposit; (xi) certificate of deposit for security; (xii) investment contract or certificate of interest or participation in a profit-sharing agreement or in an oil, gas, or mineral royalty or lease, if such contract or interest is required to be the subject of a registration statement filed with the Securities and Exchange Commission under the provisions of the Securities Act of 1933, or is exempt under section 3(b) of such Act from the requirement to file such a statement; (xiii) interest of a limited partner in a limited partnership; (xiv) other claim or interest commonly known as "security"; and (xv) certificate of interest or participation in, temporary or interim certificate for, receipt for, or warrant or right to subscribe to or purchase or sell, a security; but . . . does not include— (i) currency, check, draft, bill of exchange, or bank letter of credit; (ii) leverage transaction, as defined in section 761 of this title; (iii) commodity futures contract or forward contract; (iv) option, warrant, or right to subscribe to or purchase or sell a commodity futures contract; (v) option to purchase or sell a commodity; (vi) contract or certificate of a kind specified in subparagraph (A)(xii) of this paragraph that is not required to be the subject of a registration statement filed with the Securities and Exchange Commission and is not exempt under section 3(b) of the Securities Act of 1933 from the requirement to file such a statement; or (vii) debt or evidence of indebtedness for goods sold and delivered or services rendered.

11 U.S.C. § 101(49)(A)-(B).

advice that it was okay to go forward, I never thought that there would be a need for a mortgage deed. . . . It was not something I knew to be required and no one had suggested [a mortgage deed was required] after Ms. Samuel talked with . . . other lawyers."). I find that Miller intended to protect Samuel by pledging her Milford property and that she reasonably thought she secured the promissory note with her Milford property.

Further, Samuel consulted with Attorney Deborah Stevenson ("Attorney Stevenson") regarding the promissory note. Doc. No. 16 at 58 (Samuel testimony) ("And then [Miller] said, I'll draft up the promissory note and then you could have another attorney look at it. And I had another attorney look at it."); *id.* 70 (testifying that Samuel read the language of the promissory note to Attorney Stevenson over the phone). At that point, it was Attorney Stevenson's duty to confirm whether Samuel needed a mortgage note to ensure that her interest in the property was secured. Doc. No. 16 at 70 (testifying that Attorney Stevenson did not suggest any questions for Samuel to ask or think there was something particularly risky about the loan).

The evidence does not clearly and convincingly demonstrate that Miller knowingly or recklessly misrepresented that her Milford property secured the promissory note. *See Somers v. Statewide Grievance Comm.*, 245 Conn. 277, 290-91 (1998) (stating the burden for clear and convincing evidence requires the reasonable belief that the probability that the facts asserted "are true or exist is substantially greater than the probability that they are false or do not exist"). Although neither Samuel nor Samuel's attorney insisted on drafting a mortgage deed to accompany the promissory note, the promissory note Miller drafted created a legally enforceable debt obligation.[4] *Ankerman v. Mancuso*, 271 Conn. 772, 778 (2004) ("A promissory note and a mortgage securing the note thus give rise to separate causes of action. . . . 'A [creditor] may

---

[4] The Grievance Committee observes that a signed promissory does not exist in the record, therefore, my analysis is based on the draft, unsigned promissory note in the record. Doc. No. 23 at 6; Doc. No. 19-3.

pursue an action at law for the amount due on the promissory note . . . .'") (quoting *F.D.I.C. v. Voll*, 38 Conn. App. 198, 206 (1995)).  *See* Doc. No. 23 at 6; *Aquarion Water Co. of Connecticut v. Beck L. Products and Forms, LLC*, 98 Conn. App. 234, 238-41 (2006) (affirming a court's holding that an unsigned agreement was enforceable).

Moreover, there is no evidence in the record indicating that Miller represented to Samuel that repayment of the loan "was the only possible outcome."  Doc. No. 12 at 10.  *See also* Doc. No. 16 at 18 (asserting Miller "should have at least considered" a bankruptcy proceeding as a possible outcome).  Miller's insistence on drafting a promissory note and having Samuel review the note with an attorney evince that Miller sought to protect Samuel in case Miller could not repay the loan.  Doc. No. 16 at 159; *id.* at 160 (Miller describing her suggestion that Samuel consult another attorney regarding the promissory note as an effort to ensure "Samuel was not being taken advantage of by [Miller] in any way").  Additionally, the material terms of the promissory note included a due date of November 30, 2021 and a $200 per month late charge.  Doc. No. 19-3 at 1.  Miller's inclusion of a potential late fee expressly accounts for the possibility that Miller would not repay Samuel on time.[5]

Further, Miller filing for bankruptcy did not disrupt her efforts to repay Samuel.  The record shows that Miller instructed Samuel to file a proof of claim in Miller's bankruptcy proceeding and attempted to secure a $40,000 payment for Samuel during the bankruptcy proceeding.[6]  Doc. No. 21 at 91 (encouraging Samuel to file a proof of claim in Miller's bankruptcy proceeding); Doc. No. 16 at 83 (confirming that Miller "asked the bankruptcy court for permission to take out a loan against property" so she could pay Samuel $40,000).  At no point did Miller indicate to Samuel that she no longer intended to repay Samuel's loan.

---

[5] In any event, an attorney's failure to pay a contractual obligation on time, without more, is not unethical.
[6] Samuel testified that she chose not to file a proof of claim with the bankruptcy court.  Doc. No. 16 at 83.

Finally, it is puzzling that the trial court concluded that Miller misrepresented her ability to repay Samuel's loan when the record indicates that Miller did, in fact, repay Miller's loan. *See* Doc. No. 12 at 8 ("[Samuel] was the first creditor that [Miller] paid, making a payment of $42,000.00."). Notably, the state court's decision did not indicate when Miller repaid Samuel, yet it cites Miller's inability to pay Samuel back as quickly as Miller hoped in its finding of misconduct. Doc. No. 12 at 11 (noting Miller's bankruptcy filing resulted in her "inability to repay [Samuel] in a timely manner, despite the respondent's reassurances to the contrary"); *id.* (stating Miller "led [Samuel] to believe that [Miller] would be able to repay the loan quickly").

As stated above, the promissory note explicitly provided for a monetary penalty if Miller did not repay Samuel by November 30, 2021. Doc. No. 19-3 at 1. The state court also concluded that Miller believed in mid-October that she would be approved for a $150,000 loan from a private lender. Doc. No. 12 at 7. Miller testified that she did not know filing for bankruptcy would impact her ability to obtain her pre-approved loan. Doc. No. 16 at 141 (testifying that she had just received a loan commitment letter and did not think her filing for bankruptcy would "shutdown that process"). The loan commitment was only withdrawn after Miller "was unable to meet the additional loan conditions the lender" imposed following Miller's bankruptcy filing. Doc. No. 12 at 7. There is no indication that Miller knew about those additional conditions when she made statements about when she could repay Samuel. Therefore, the evidence does not clearly show that Miller's representations to Samuel about her ability to repay the loan and when she would be able to do so were knowingly or recklessly false.

On the face of the record, there is clearly "an infirmity of proof establishing" that Miller made misrepresentations to Samuel that her Milford property secured the promissory note, that repayment was the only possible outcome, or that she had the ability to repay the loan. D. Conn.

L. Civ. R. 83.2(f)(5)(b).  The record shows that Miller's representations to Samuel during the negotiation of the loan and during the bankruptcy proceedings were not knowingly false or made with a reckless disregard to their truth.  Instead, Miller sought to engage in an honest transaction on equal legal footing with Samuel.  Both the record and Miller's testimony clearly and convincingly demonstrate that the state court's conclusion was not adequately supported and, therefore, suffers from an infirmity of proof under Local Rule 83.2(f)(5)(b).  D. Conn. L. R. 83.2(f)(5)(b).

Accordingly, I decline to enter reciprocal discipline of a one-year suspension, or any lesser discipline, based on Miller's alleged violation of RPC 8.4(3).

B.  *Whether imposing identical discipline would result in a grave injustice*

The exception under Local Rule 83.2(f)(5)(c) allows for the imposition of different discipline if imposition of an identical disciplinary sanction by the court would result in a grave injustice.  The state court disbarred Miller for engaging in the unauthorized practice of law in violation of Rule 5.5.  Doc. No. 12 at 23.

Miller argues that the state court's discipline should not be given the "imprimatur of correctness" because it is the result of:  "(a) the decades long false narrative by the Appellate Court of misconduct; (b) decision-making on the current discipline by a conflicted judge; and (c) wildly different treatment of [Miller] and comparator lawyers."  Doc. No. 8 at 5.  The Grievance Committee asserts that the state court "carefully considered both aggravating and mitigating factors in concluding . . . disbarment was appropriate" for Miller's violation of Rule 5.5.  Doc. No. 16 at 8 (citing Doc. No. 12 at 19-23).  Additionally, the Grievance Committee contends that Miller has not established "reciprocal discipline would be disproportionate, lead to racial

inequities, and ignore factors outside of [Miller's] control." Doc. No. 16 at 8 (citing Doc. No. 8 at 22-32).

Samuel claims that Miller offered her legal advice from March 2021 to May 2021 regarding a bank settlement negotiation while Miller was suspended as an attorney and therefore not authorized to practice law. Doc. No. 12 at 2-3, 12-13. Miller and Samuel had been friends for over a decade and Samuel relied on Miller for Miller's "legal advice and expertise in legal matters" at the time of their communications concerning the bank settlement. *Id.* at 1-2.

In March 2021, Samuel "was prevented from withdrawing funds from her business account" at a bank. *Id.* at 2. Believing she experienced racial discrimination, Samuel "hired an out-of-state attorney [from Maryland] to prepare an initial draft demand letter outlining her complaints." *Id.*; Doc. No. 16 at 45, 178. Miller communicated to Samuel her concern that Samuel would be charged a forty percent contingency fee by the Maryland attorney and encouraged Samuel to negotiate her own settlement. Doc. No. 12 at 2-3; Doc. No. 16 at 178-79. Further, Samuel informed Miller that the Maryland attorney was not "registered," presumably meaning not licensed in Connecticut. Doc. No. 16 at 45, 107-108. At Samuel's request, Miller reviewed an initial demand letter and recommended revised language on March 17, 2021. Doc. No. 12 at 3. Additionally, the state court found that Miller drafted an April 11, 2021 settlement demand letter to the bank. *Id.* However, Miller credibly maintains she did not actually draft the April 11 demand letter nor any other documents sent to the bank.[7] Finally, Miller emailed

---

[7] Miller submitted additional evidence supporting her assertion that she did not draft the letter. *See* Doc. No. 22 at 1-2; Doc. No. 22-1; Doc. No. 22-2 at 1-4. Under Local Rule 83.2(f), my analysis is confined to "the face of the record upon which the discipline in another jurisdiction is predicated." D. Conn. L. Civ. R. 83.2(f)(5); *In re Williams*, 978 F. Supp. 2d 123, 125 (D. Conn. 2012). I limit my determination to the record of the state court proceeding, which did not include Miller's supplemental evidence. However, I note that the emails Miller submits support her testimony that she did not draft any documents for Samuel. Further, those emails call into question the state court's conclusion that Miller engaged in the unauthorized practice of law, because it is far less clear whether simply commenting on already drafted documents, as opposed to drafting legal documents, constitutes the practice of law. *Cf. Statewide Grievance Comm. v. Patton*, 239 Conn. 251, 254 (1996) (non-attorney preparing legal

13

Samuel on May 30, 2021 recommending two changes to a proposed settlement agreement and release, including the addition of a non-disparagement clause.  Doc. No. 12 at 3.[8]  Miller's suggested edits are the type of comments a savvy non-lawyer might propose; they did not require any special legal training.

Rule 5.5 prohibits a lawyer from practicing law "in a jurisdiction in violation of the regulation of the legal profession in that jurisdiction."  Conn. R. Pro. Conduct 5.5.  Connecticut law states that an attorney who "has been disqualified from the practice of law due to resignation, disbarment, being placed on inactive status or suspension, shall not . . . (1) [p]ractice law or appear as an attorney-at-law for another in any court of record in this state."[9]  Conn. Gen. Stat. § 51-88.

"Attorney disciplinary proceedings are 'for the purpose of preserving the courts from the official ministration of persons unfit to practi[c]e in them.'"  *Statewide Grievance Committee v. Shluger*, 230 Conn. 668, 674 (Conn. 1994) (quoting *Ex parte Wall*, 107 U.S. 265, 288 (1883)).

---

documents was engaged in the unauthorized practice of law) ("[T]he preparation of legal documents is commonly understood to be the practice of law."); *Monroe v. Horwitch*, 820 F. Supp. 682, 686 (D. Conn. 1993), *aff'd*, 19 F.3d 9 (2d Cir. 1994) (holding the "[p]reparation of instruments, even with preprinted forms, . . . constitutes the practice of law").  Offering comments on draft documents is an activity that can be undertaken by laymen because it requires no specialized legal training.  When services may also be performed by nonlawyers, it is relevant whether the person "provides all the external indicia of the practice of law."  *Persels & Assocs., LLC v. Banking Com'r*, 318 Conn. 652, 674 (2015) (listing holding oneself out as a law firm, entering into retainer agreements expressly providing legal services, and entering attorney-client relationships as indicia of legal practice).

[8] The state court does not base its finding on Miller's communications with Samuel after May 2, 2021 because Miller was reinstated to the District of Connecticut Bar on May 3, 2021.  Doc. No. 16 at 2-3 n.1; Doc. No. 12 at 17-18.

[9] Disbarred or suspended attorneys also shall not:

> (2) [M]ake it a business to practice law or appear as an attorney-at-law for another in any such court, (3) make it a business to solicit employment for an attorney-at-law, (4) hold himself or herself out to the public as being entitled to practice law, (5) assume to be an attorney-at-law, (6) assume, use or advertise the title of lawyer, attorney and counselor-at-law, attorney-at-law, counselor-at-law, attorney, counselor, attorney and counselor, or an equivalent term, in such manner as to convey the impression that he or she is a legal practitioner of law, (7) advertise that he or she, either alone or with others, owns, conducts or maintains a law office, or office or place of business of any kind for the practice of law, or (8) otherwise engage in the practice of law as defined by statute or rule of the Superior Court.

Con. Gen. Stat. § 51-88.

14

Discipline imposed by courts is done "not to mete out punishment to an offender, but [so] that the administration of justice may be safeguarded and the courts and the public protected from the misconduct or unfitness of those who are licensed to perform the important functions of the legal profession." *Statewide Grievance Committee v. Botwick*, 226 Conn. 299, 307 (Conn. 1993) (alteration in original) (internal quotation marks omitted (quoting *In re Durant*, 80 Conn. 140, 147 (1907)). *See also Statewide Grievance Committee v. Rozbicki*, 211 Conn. 232, 238 (Conn. 1989) ("The object of [an attorney disciplinary proceeding] is not the punishment of the [attorney], but the protection of the court.").

"[T]he sanction of disbarment is the most serious penalty an attorney can endure . . . ." *Burton v. Mottolese*, 267 Conn. 1, 59 (2003). *See also Ex parte Wall*, 107 U.S. 265, 303 (1883) (Field, J., dissenting) ("The power to disbar attorneys in proper cases . . . is not to be exercised arbitrarily or tyrannically.").

Disbarment from the state court on which an attorney's federal bar membership is based does not automatically result in disbarment from the federal bar. *In re Kandekore*, 460 F.3d 276, 279 (2d Cir. 2006). The Supreme Court has held that a federal court should not impose reciprocal disbarment based on a state court disbarment where there: (1) was an "absence of due process in the state procedure[;]" (2) was a "substantial infirmity in the proof of lack of private and professional character[;]" or (3) "'some other grave reason' sufficient to indicate that reciprocal disbarment was inconsistent with 'principles of right and justice.'" *In re Tidwell*, 295 F.3d 331, 333-34 (2d Cir. 2002) (quoting *Selling v. Radford,* 243 U.S. 46, 51 (1917)).

Additionally, Connecticut courts are guided by the American Bar Association's Standards for Imposing Lawyer Sanctions (the "A.B.A. Standards") in determining what discipline to impose. *Statewide Grievance Committee v. Shluger*, 230 Conn. 668, 673 n.10

15

(Conn. 1994) (noting the ABA Standards "have not formally been adopted by" Connecticut judges). *See, e.g., Burton*, 267 Conn. at 55; *Statewide Grievance Committee v. Spirer*, 247 Conn. 762, 782-83 (Conn. 1999). After a court finds an attorney committed misconduct, the A.B.A. Standards direct a court to consider: "(1) the nature of the duty violated; (2) the attorney's mental state; (3) the potential or actual injury stemming from the attorney's misconduct; and (4) the existence of aggravating or mitigating factors."[10] *Burton*, 267 Conn. at 55. In cases involving the unauthorized practice of law and absent aggravating or mitigating circumstances,

> [d]isbarment is generally appropriate when a lawyer knowingly engages in conduct that is a violation of a duty owed as a professional with the intent to obtain a benefit for the lawyer or another, and causes serious or potentially serious injury to a client, the public, or the legal system.

A.B.A., *Standards for Imposing Lawyer Sanctions*, 7.1 Violations of Duties Owed As A Professional (2d ed. 2019). Further, the A.B.A. Standards provide that in cases involving prior discipline and absent aggravating or mitigating circumstances:

> Disbarment is generally appropriate when a lawyer: (a) intentionally or knowingly violates the terms of a prior disciplinary order and such violation causes injury or potential injury to a client, the public, the legal system, or the profession; or (b) has been suspended for the same or similar misconduct, and intentionally or knowingly

---

[10] The A.B.A. Standards list aggravating factors as:
> (a) prior disciplinary offenses; (b) dishonest or selfish motive; (c) a pattern of misconduct; (d) multiple offenses; (e) bad faith obstruction of the disciplinary proceeding by intentionally failing to comply with rules or orders of the disciplinary agency; (f) submission of false evidence, false statements, or other deceptive practices during the disciplinary process; (g) refusal to acknowledge wrongful nature of conduct; (h) vulnerability of victim; (i) substantial experience in the practice of law; [and] (j) indifference to making restitution.

*Burton v. Mottolese*, 267 Conn. at 55 (alteration in original) (internal quotation marks omitted) (quoting A.B.A., *Standards for Imposing Lawyer Sanctions*, 9.22 Aggravation (2d ed. 2019)). The A.B.A. Standards list mitigating factors as:
> (a) absence of a prior disciplinary record; (b) absence of a dishonest or selfish motive; (c) personal or emotional problems; (d) timely good faith effort to make restitution or to rectify consequences of misconduct; (e) full and free disclosure to disciplinary board or cooperative attitude toward proceedings; (f) inexperience in the practice of law; (g) character or reputation; (h) physical or mental disability or impairment; (i) delay in disciplinary proceedings; (j) interim rehabilitation; (k) imposition of other penalties or sanctions; (*l*) remorse; [and] (m) remoteness of prior offenses.

*Burton*, 267 Conn. at 55-56 (alteration in original) (internal quotation marks omitted) (quoting A.B.A *Standards for Imposing Lawyer Sanctions*, 9.23 Mitigation (2d ed. 2019)).

engages in further similar acts of misconduct that cause injury or potential injury to a client, the public, the legal system, or the profession.

A.B.A., *Standards for Imposing Lawyer Sanctions*, 8.1 Prior Discipline Orders (2d ed. 2019).

In applying the A.B.A. Standards, the state court found that Miller "violated a duty to the legal profession and to the court by engaging, . . . in the unauthorized practice of law."[11]  Doc. No. 12 at 21.  Additionally, the state court stated Miller was aware of her actions and conduct because she knew that she was not licensed to practice law when she provided suggestions and comments to Samuel.  *Id.*

Notably, it appears that Miller's suggestions and comments on documents in the bank settlement negotiations did not harm Samuel.  Doc. No. 12 at 3 (stating that Samuel requested $350,000 in her settlement demand and eventually entered a confidential settlement for $205,000).  The state court identified no harm or potential harm stemming from Miller's alleged unauthorized practice of law.  *Id.* at 21.  The record shows that Miller did not intend to financially gain from aiding Samuel and instead sought to help a friend avoid paying a forty percent contingent fee.  Doc. No. 12 at 2-3.

I acknowledge the aggravating factor of Miller's previous disciplinary proceedings and findings of misconduct.  *See* Doc. No. 12 at 8-9 (listing a 2014 six-month suspension due to "irresponsibility in handling [Miller's] professional obligations . . . in appellate court" and a 2015 reprimand for false statements); *Federal Grievance Committee v. Josephine Smalls Miller*, Dkt. No. 18-gp-35-SRU ("2018 FGC Case"), Doc. No. 1 at 38-38 (detailing a one-year suspension beginning in 2018 for violating Rules 1.15(a)(5), 1.15(c), 1.3, 1.4(a)(5), 1.4(b), 3.2,

---

[11] I do not consider persuasive the state court's application of the A.B.A. Standards to Miller's alleged misconduct under Rule 8.4(3) because, as explained above, that allegation of misconduct suffers from an infirmity of proof.  *See* Doc. No. 12 at 21 (stating that Miller "violated the duty of candor and loyalty to [Samuel] regarding the loan" and caused Samuel "personal distress and financial harm with regard to the repayment of the loan").

5.5, 8.1(2), and 8.4(4)).  Further, Miller's most recent suspension included conduct amounting to the unauthorized practice of law, the same violation at issue in this proceeding.

Several of the mitigating factors listed in the A.B.A. apply to Miller.  Throughout the proceedings, Miller has demonstrated her character as being forthright, cooperative, and well-intentioned.  Miller did not evince a dishonest or selfish motive in either instance of alleged misconduct.  Miller demonstrated "full and free disclosure to the disciplinary board" and cooperated during the disciplinary proceedings.  A.B.A *Standards for Imposing Lawyer Sanctions*, 9.23 Mitigation (2d ed. 2019)).  *See* Doc. No. 12 at 23 (noting Miller's cooperative attitude, courtesy, and professionalism).  Further, it is unclear why Miller's suspension from practicing law was still in effect at the time of the conduct at issue.  Miller's one-year suspension began on November 26, 2018.  2018 GPC Case, Doc. No. 39 at 5.  She became eligible for reinstatement in April 2020 when she took and passed the MPRE.  *Id.*  However, as I noted in my May 3, 2021 order reinstating Miller to the District of Connecticut Bar:

> A year later, Miller is no closer to being admitted to the Connecticut State Bar.  Thus, the imposition of what should have been, for all practical purposes, a six-month suspension from practicing law in this Court has turned into a nearly two-year suspension: far longer than necessary to achieve its intended purpose.

*Id*.  Therefore, Miller's instant offense is, in part, a result of delayed reinstatement proceedings and this proceeding is almost ten years removed from the original conduct resulting in the unauthorized practice of law.  *See id.*; 2018 GPC Case, Doc. No. 1 at 17-24 (describing Miller engaging in the unauthorized practice of law in 2016); A.B.A., *Standards for Imposing Lawyer Sanctions*, 9.23 Mitigation (2d ed. 2019) (listing a delay in disciplinary proceedings and the remoteness of prior offenses as mitigating factors).

Notwithstanding the state court's conclusion that Miller engaged in the unauthorized practice of law, Miller's conduct does not rise to the level warranting disbarment.  I disagree

18

with the state court's application of the A.B.A. Standards in Miller's case, and disbarring Miller based on her communications to Samuel would be a grave injustice. Doc. No. 12 at 21-23; D. Conn. L. R. 83.2(f)(5)(c). *See also In re Tidwell*, 295 F.3d 331, 333-34 (2d Cir. 2002) (noting reciprocal discipline should not be imposed where it would be inconsistent with "principles of right and justice") (quoting *Selling v. Radford,* 243 U.S. 46, 51 (1917)).[12]

Disbarment is not an appropriate sanction for Miller under A.B.A. Standards 7.1 and 8.1. Miller did not "knowingly engage[] in conduct" violating her professional duties "with the intent to obtain a benefit" for herself or anyone other than Samuel herself. A.B.A., *Standards for Imposing Lawyer Sanctions*, 7.1 Violations of Duties Owed As A Professional (2d ed. 2019). Miller did not cause serious injury to Samuel (who seemingly benefitted from the challenged acts), the public, or the legal system and the state court did not identify any such injury. *Id.*

Miller testified that she did not intend to act as Samuel's lawyer by commenting on the demand letter and the proposed settlement agreement and was only seeking to assist a friend. She also explained that there was no active attorney-client relationship between her and Samuel. At most, Miller technically violated her 2018 disciplinary order, yet her one-year suspension was extended for over two years because of delayed reinstatement proceedings. *See* 2018 GPC Case, Doc. No. 39 at 5. Additionally, Miller's conduct in the presentment at issue is much different than her previous conduct constituting the unauthorized practice of law. *See* 2018 GPC Case, Doc. No. 1 at 17-24. Previously, Miller intentionally represented a client in the Connecticut Appellate Court while knowingly suspended from that court. *Id.* at 18-22 (executing a retainer that explicitly contemplated Miller providing legal services at the appellate level). The mitigating factors in the instant proceeding distinguish this case from Miller's prior unauthorized

---

[12] I find it unnecessary to reach Miller's allegations of bias and potential conflicts of interest on the part of Judges Bellis and Carroll.

practice of law. Accordingly, the sanction of disbarment is not supported by the alleged misconduct. A.B.A., *Standards for Imposing Lawyer Sanctions*, 8.1 Prior Discipline Orders (2d ed. 2019).

Finally, the state court's disbarment of Miller seems more punitive than protective of the public. *See Statewide Grievance Committee v. Botwick*, 226 Conn. 299, 307 (Conn. 1993) (holding attorney discipline is not intended to punish, but to safeguard the administration of justice and protect the public); *Office of Chief Disciplinary Counsel v. Cramer*, 2022 WL 6690150, at *5 (Conn. Super. Oct. 3, 2022) (holding a five-year disbarment was not warranted because the OCDC's position "appear[ed] to reflect punitive or retributive considerations"). Miller's communications with Samuel did not involve holding herself out to the public as an attorney, the intent to harm, or the intent to gain a pecuniary advantage. Those communications aided Samuel without any prospect of gain by Miller.

The record demonstrates that Miller fully appreciates the ramifications of her conduct and that Miller is unlikely to engage in similar conduct. Under the totality of the circumstances, disbarring Miller would result in a grave injustice. D. Conn. L. Civ. R. 83.2(f)(5)(c). Accordingly, an order imposing reciprocal discipline is not warranted in this case.

## IV.    Conclusion

For the foregoing reasons, I **decline to enter reciprocal discipline** against Miller. Miller's Motion to Dismiss is **denied as moot**. Doc. No. 8.

So ordered.

Dated at Bridgeport, Connecticut, this 18th day of March 2026.

/s/ STEFAN R. UNDERHILL
Stefan R. Underhill
United States District Judge

20